**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

IN RE:

QuVIS, INC.,

      *Debtor,*

_____

DOUGLAS A. FRIESEN, M.D.; MARILYN
R. FRIESEN GREENBUSH, Ph.D.;
DOUGLAS C. CUSICK; JFM LIMITED
PARTNERSHIP I; and UNSECURED
CREDITORS' COMMITTEE,

      *Plaintiffs,*

vs.

SEACOAST CAPITAL PARTNERS II, L.P.,

      *Defendant.*

Case No. 11-1072-EFM

**MEMORANDUM AND ORDER**

      Plaintiffs appeal from the bankruptcy court's decision to grant Defendant summary judgment

on Plaintiffs' adversary action requesting equitable subordination of Defendant's secured interest

in the debtor's assets.  The Bankruptcy Code gives courts the discretion to equitably subordinate

creditors' claims if the creditor engaged in inequitable conduct that injured other creditors and if

-1-

subordination is not inconsistent with other provisions of the Bankruptcy Code. Plaintiffs claim that Defendant—whose Managing Director sat on the debtor's board of directors—committed misconduct when it filed its own UCC-1 financing statement after the debtor's financing statement lapsed, thereby giving Defendant's security interest priority over the Plaintiffs' unsecured interest. Because there is no genuine issue of material fact as to whether Defendant engaged in inequitable conduct, the Court affirms the bankruptcy court's decision to grant Defendant summary judgment.

## I. Factual and Procedural Background[1]

The debtor, QuVIS Inc., was a Topeka technology company offering digital motion imaging technology. Plaintiffs are unsecured creditors of the debtor who purchased promissory notes from QuVIS prior to 2005. Defendant Seacoast Capital Partners II, L.P., is a licensed Small Business Investment Company ("SBIC") as defined in the Small Business Investment Act of 1958.[2] On June 1, 2005, after conducting due diligence, Seacoast purchased a promissory note after loaning QuVIS the sum of $3,160,066.40 (the "June 2005 Note"). The note was issued in accordance with a security agreement QuVIS entered with all Noteholders—including Plaintiffs— that was dated June 30, 2003 ("2003 Note Agreement" or "Note Agreement").[3]

QuVIS also executed a Joinder Agreement that outlined the terms of the sale of Seacoast's June 2005 Note.[4] The Joinder Agreement named Seacoast as a Lender subject to the provisions of the 2003 Note Agreement. It also permitted Seacoast to place a representative on QuVIS's board

---

[1] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

[2] Pub. L. No. 85-699, 72 Stat. 689 (1958).

[3] The 2003 Note Agreement was entitled "First Amended and Restated Convertible Loan and Security Agreement" and had a maturity date of June 30, 2006. *See* Doc. 3-4.

[4] Doc. 3-2, p. 5.

of directors and to designate a person to observe all board meetings.[5]  The QuVIS board of directors approved the Joinder Agreement after "full discussion and careful[] consider[ation]."[6]  Neither Seacoast nor its Managing Director, Eben Moulton—who later sat on QuVIS's board of directors—were involved in the negotiation of the 2003 Note Agreement or 2005 Joinder Agreement.  Both Seacoast and Moulton understood that the Note Agreement set forth collateral sharing terms such that no lien was subordinate to any other interest held by QuVIS's Lenders.[7]  The parties agree that Seacoast would not have accepted the promissory notes if Seacoast's interest was subordinate to existing lienholders.[8]

On May 3, 2006, Eben Moulton was elected to serve on QuVIS's board as an outside director.  Moulton previously served as an outside director on the boards of many small business companies to which Seacoast provided venture capital, as well as boards of public companies.  Moulton's service on QuVIS's board of directors is consistent with Moulton's understanding that the Small Business Investment Act encourages SBICs to support the management of the small business ventures in which the SBIC invests.

---

[5]  *See id.* at 14 ("The Company will (a) permit New Lender to designate one (1) person to attend all meetings of the Company's board of directors . . . , (d) permit New Lender, so long as New Lender holds a Note or owns any stock, warrants or other equity interest in the Company, to designate one (1) Person to serve as a member of the Company's board of directors . . . .").

[6]  *Id.* at 1.

[7]  *See* Doc. 3-4.  Section 10.02(a)(iv) states that in the event of default, "[a]ll amounts received by the Lenders upon the exercise of its remedies hereunder shall be applied by Lenders, pro rata based on the outstanding principal amount of Notes issued under this Agreement."  *Id.* at 18.

[8]  The bankruptcy court noted that Seacoast signed a Subordination Agreement with two majority-interest Noteholders, Owen Leonard and Vernon Nelson.  *See* Doc. 4-2, pp. 44–49.  Leonard and Nelson agreed to subordinate their interests in QuVIS "to induce [Seacoast] to enter into the Loan Agreement and any other agreements related thereto."  *Id.* at 44.  Although this Subordination Agreement does indicate that Seacoast never intended to enter an agreement that placed its security interest below other lenders', the Subordination Agreement also contradicts Seacoast's claim that it believed all lenders would receive a pro rata share of QuVIS's assets in the event of default.

The parties' agreement also stated that QuVIS was responsible for perfecting Seacoast's interest in the promissory notes.[9]   The parties agree that QuVIS generally filed UCC filing statements on behalf of the Lenders.  QuVIS filed the original financing statement with the Kansas Secretary of State on March 14, 2002, and filed UCC-2 Financing Statement Amendments to subsequently add the names of new secured parties.  Plaintiffs's security interests were all secured under QuVIS's 2002 financing statement.  But unbeknownst to the parties, QuVIS never filed a UCC-2 amendment naming Seacoast as a secured party under the original 2002 financing statement.  In fact, after Seacoast loaned QuVIS an additional $719,933.60 on November 2, 2005, QuVIS again neglected to file a UCC-2 amendment.   As a result, Seacoast's security interests were never perfected.[10]

On March 14, 2007, the UCC-1 financing statement that QuVIS filed in 2002 lapsed by operation of state law.[11]   On that same day, by coincidence, Seacoast loaned QuVIS an additional $350,000 and received another promissory note.   Neither Seacoast nor QuVIS filed any UCC financing statements for this loan.   Moulton believed that the March 2007 note was perfected, but did not verify the status of the lien.  If Moulton had known that QuVIS's 2002 UCC-1 financing statement had lapsed, Moulton would have acted to ensure the proper legal documentation was filed to secure Seacoast's lien.

---

[9] *See* Doc. 3-4, p. 8 ("In order to perfect such security interest, Borrower shall: make such filings and take such other actions as may be required under the Uniform Commercial Code of the State of Kansas or other jurisdiction.").

[10] *See* Doc. 7-8, p. 22, n.67.

[11] *See* Kan. Stat. Ann. § 84-9-515 (2010) ("[A] filed financing statement is effective for a period of five years after the date of filing.").

According to the 2003 Note Agreement, as well as Moulton's understanding, when QuVIS's loans matured on June 30, 2007, each Lender would have the option of either (1) exchanging the note for QuVIS stock pursuant to a detailed formula, or (2) receiving cash payment on the note.  In the spring of 2007, Moulton and the other QuVIS board members searched for a new funding source to retire the obligations of Lenders who might elect cash payment.  Moulton believed the investment banking firm Pacific Crest Securities was a potential source of funding.  In April 2007, Moulton and other QuVIS board members met with Pacific Crest and negotiated an engagement letter.  When the QuVIS board members realized that they could not close the deal with Pacific Crest before the June 30, 2007, maturity date of the Notes, the board decided to request that the Lenders extend the maturity date.  On May 31, 2007, board member Owen Leonard circulated a draft letter for the board's consideration.  The letter requested that the Lenders extend the June 30, 2007, maturity date to September 30, 2007.  After receiving feedback from the other directors, including Moulton, QuVIS sent the letter to the Lenders on June 7, 2007.  The letter did not mention that the 2002 financing statement had lapsed, and the board's minutes from 2007 do not reference the lapse.

After receiving the letter from the QuVIS board of directors, Seacoast asked its outside counsel to review the letter and offer advice.  Seacoast's attorneys obtained a UCC search report, which did not show any financing statement or amendment securing Seacoast's loans, nor did the report list QuVIS's lapsed 2002 financing statement.  On June 14, 2007, Seacoast filed a UCC-1 financing statement to perfect its security interest in QuVIS.[12]  Two other Lenders, Greg Kite and The Christine Baugher Trust, filed UCC-1 financing statements on June 7, 2007.  Directors Leonard

---

[12]  The Note Agreement permitted Lenders "to perform every act which such Lender considers necessary to protect and preserve the Collateral and Lenders' interest therein."  Doc. 3-4, p. 18.

and Nelson did not file UCC-1 statements until January 2009, and Plaintiffs filed financing statements in 2008.

Plaintiffs brought an involuntary Chapter 11 bankruptcy suit against QuVIS on March 20, 2009. [13] QuVIS consented to an order for relief that was entered on May 18, 2009.  In its Disclosure Statement and Plan, QuVIS proposed to treat all Lenders under the 2003 Note Agreement equally as secured creditors with equal priority such that all Lenders would receive a pro rata share of QuVIS's assets.  Seacoast filed a document in support of QuVIS's proposal, arguing that all of the original Lenders' liens could be perfected upon the filing of a UCC-1 financing statement by any one of the Lenders.  In its order determining the secured status of QuVIS's noteholders ("Secured Status Order"), [14] the bankruptcy court denied QuVIS's request to classify all of the Lenders as equals.  The bankruptcy court found that "the Loan Agreement did not abrogate the first to file rule under the circumstances here and that payments to the Noteholders who filed new UCC-1s should be made in the order in which each Noteholder filed a financing statement." [15]  Applying the first-to-file rule, the bankruptcy court found that Seacoast's interest was subordinate to liens held by J. Greg Kite and the M. Christine Baugher Revocable Living Trust, but superior to Plaintiffs' secured claims.  Kite claimed $133,933 of QuVIS's assets, the Trust claimed $133,363, and Seacoast claimed $5.3 million.  Because QuVIS's assets amount to only $1.3 million, none of the Plaintiffs have security for their claims.

---

[13] The bankruptcy court converted QuVIS's Chapter 11 bankruptcy to a Chapter 7 bankruptcy on May 12, 2011. Order Granting Motion to Convert Case to Chapter 7, *In re QuVIS, Inc.*, No. 09-10706 (Bankr. D. Kan. May 12, 2011), ECF No. 515.

[14] Doc. 7-8 (entitled "Order on Debtor's Motion to Determine the Secured Status of the Noteholders").

[15] *Id.* at 22.

In response to the bankruptcy court's ruling, Plaintiffs filed an adversary suit against Seacoast, arguing that Seacoast's lien should be equitably subordinated to an unsecured claim under section 510(c) of the Bankruptcy Code.[16]  Plaintiffs alleged that Seacoast, through Moulton's position on QuVIS's board of directors, had actual or constructive knowledge of the lapse of QuVIS's 2002 financing statement, and that Seacoast had a fiduciary duty to notify the other Noteholders of the lapse.  Plaintiffs argued that Seacoast acted unfairly when it filed its own UCC-1 financing statement, and that Seacoast's actions were a result of its alleged insider status.  Seacoast moved for summary judgment on Plaintffs' claims.  The bankruptcy court granted the motion for summary judgment, holding that Seacoast was not an insider and did not engage in gross misconduct by filing its UCC-1.  Plaintiffs subsequently filed this appeal.  Plaintiffs' claim for equitable subordination presents no genuine issue of material fact.  Because Seacoast is not an insider of QuVIS's and its conduct in filing a UCC-1 financing statement does not rise to the level of gross misconduct, the Court affirms the bankruptcy court's decision to grant Seacoast summary judgment.

## II.  Analysis

### A.    Plaintiffs' Appeal is Not Moot.

First, the Court must determine whether it has jurisdiction over this appeal.[17]  Seacoast argues that the appeal is moot because QuVIS's assets were purchased at a foreclosure sale on March 7, 2011.  After the bankruptcy court issued its Secured Status Order, Seacoast requested that the court lift the automatic stay on QuVIS's assets and permit Seacoast to seek a state foreclosure

---

[16]  11 U.S.C. § 510(c).

[17]  *See Golfland Entm't Ctrs, Inc. v. Peak Inv., Inc.* (*In re BCD Corp.*), 119 F.3d 852, 856 (10th Cir. 1997) ("We address the issue of mootness as a threshold question because in the absence of a live case or controversy, we have no subject-matter jurisdiction over an appeal.").

sale of the collateral.  The bankruptcy court found that Seacoast was entitled to have the stay lifted because QuVIS had no equity remaining in the property and the parties could not agree on a reorganization plan.[18]  But the court also set several conditions on the foreclosure sale, including a requirement that the sale could not close until "the Court has decided the equitable subordination adversary proceeding" if the prevailing party was a credit-bidder.[19]  After the bankruptcy court approved Seacoast's bidding instructions for the sale, Seacoast conducted a public auction of the collateral on December 28, 2010, and was the winning bidder.[20]  The court granted Seacoast's motion for summary judgment on the equitable subordination claim on February 18, 2011.  Plaintiffs did not move for a stay pending appeal, and on March 7, 2011, Seacoast closed the bankruptcy sale.  After making a cash payment to both of its senior creditors, Seacoast assigned its rights in the collateral to the company QuVIS Technologies, Inc.  Because it sold the collateral to a third party, Seacoast argues that Plaintiffs have no remedy in law or equity.

Under Article III of the Constitution, federal-court jurisdiction is limited to justiciable cases and controversies.[21]  A justiciable case or controversy is one that presents the court with a question "in an adversary context and in a form historically viewed as capable of resolution through the judicial process" and does not "intrude into areas committed to the other branches of government."[22]

---

[18]  Section 362(d)(2) of the Bankruptcy Code permits the court to terminate or modify the automatic stay if (1) the debtor has no equity in the property, and (2) the property is not necessary to an effective reorganization.

[19]  Doc. 7-11, p. 9.

[20]  Section 363(k) of the Bankruptcy Code allows a secured creditor to use up to the full amount of the debt owed to bid at a bankruptcy sale on the collateral securing the debt owed to that secured creditor.

[21]  U.S. Const. Art. III, § 2 (defining the power of the federal courts to include nine enumerated categories of "cases" and "controversies").

[22]  *Flast v. Cohen*, 392 U.S. 83, 95 (1968).

"The core of Article III's limitation on federal judicial power is that federal courts cannot issue advisory opinions."[23]  To enforce this restriction on federal-court jurisdiction, the Supreme Court relies on both Article III and certain prudential requirements announced in case law.[24]  Prudential considerations are especially prevalent in the context of bankruptcy proceedings where questions as to the court's remedial power raise the issue of mootness.[25]

Mootness is one aspect of the court's inquiry into justiciability.  As the Supreme Court has explained, the mootness doctrine requires that, "throughout the litigation, the plaintiff must have suffered, or be threatened with, and actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."[26]  In other words, a case becomes moot when the litigants no longer have standing to sue because "it becomes 'impossible for the court to grant any effectual relief whatever to a prevailing party.' "[27]  Even if relief can be granted in a bankruptcy

---

[23] Erwin Chemerinsky, *Federal Jurisdiction* §2.2 (5th ed. 2007); *see also Flast*, 392 U.S. at 96 ("[I]t is quite clear that the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." (Citation omitted) (internal quotation marks omitted)).

[24] *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 17–18 (2004) (discussing the limitations on third-party standing and domestic relations); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (prohibiting standing "when the asserted harm is a generalized grievance shared in a substantially equal measure by all or a large class of citizens"); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (holding that a "case" or "controversy" exists only when "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question"); *Flast*, 392 U.S. at 105–06 (placing limitations on taxpayer standing).

[25] *See, e.g.*, 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3533.2.3 (3d ed. 1998) (discussing equitable mootness in bankruptcy); *see also In re Manges*, 29 F.3d 1034, 1038–39 (5th Cir. 1994) ("Many courts . . . have employed the concept of 'mootness' to address equitable concerns unique to bankruptcy proceedings.").

[26] *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (citation omitted) (internal quotation marks omitted).

[27] *Boullioun Aircraft Holding Co., Inc. v. Smith Mgmt. (In re Western Pacific Airlines, Inc.)*, 181 F.3d 1191, 1194–95 (10th Cir. 1999) (quoting *Church of Scientology v. United State*, 506 U.S. 9, 12 (1992) (citation omitted)).

proceeding, federal courts may invoke their equitable discretion to find that a case is moot if the relief requested would be inequitable.[28, 29]

Application of the equitable mootness doctrine in the Tenth Circuit requires consideration of the following six questions to determine whether a decision on the merits would be unfair or impracticable: (1) whether the appellant moved for a stay pending appeal, (2) whether the reorganization plan has been substantially consummated, (3) whether the rights of innocent third parties will be adversely affected by reversal, (4) whether the public policy need for reliance on bankruptcy decisions will be undermined by hearing the appeal, (5) the impact of reversal on the successful reorganization of the debtor, and (6) whether the appeal appears to be meritorious or equitably compelling.[30]  The party asserting lack of jurisdiction based on mootness bears the burden of proof under both the constitutional and equitable mootness doctrines.[31]

In this case, Seacoast has not met its burden of proving mootness under Article III or in equity.  Plaintiffs' appeal is justiciable under the constitution because they allege that Seacoast

---

[28]  *See Search Market Direct, Inc. v. Jubber* (*In re Paige*), 584 F.3d 1327, 1337 (10th Cir. 2009) (expressly adopting the theory of equitable mootness after noting that "[e]very other circuit to consider the issue has found that 'equitable,' 'prudential,' or 'pragmatic' considerations can render an appeal of a bankruptcy court decision moot even when the appeal is not constitutionally moot"); *see also C.O.P. Coal Dev. Co. v. C.W. Mining Co.* (*In re C.W. Mining Co.*), 641 F.3d 1235, 1239–40 (10th Cir. 2011) ("Because the trustee has not affirmatively foreclosed the possibility that COP might be entitled to alternative relief that would not affect the validity of the sale, the trustee has not established that this appeal is moot.  The trustee is left with the equitable mootness doctrine.").

[29]  Seacoast did not explicitly request the Court to apply the equitable mootness doctrine, but one of the cases Seacoast cites does discuss the doctrine.  *See Sullivan Cent. Plaza, I, Ltd. v. BancBoston Real Estate Capital Corp.* (*In re Sullivan Cent. Plaza, I, Ltd.*), 914 F.2d 731, 736 (5th Cir. 1990).  And although the Tenth Circuit has not yet applied the doctrine in the Chapter 7 setting, it has been discussed.  *See In re C.W. Mining Co.*, 641 F.3d at 1239–40.  Out of an abundance of caution, the Court will briefly address the issue.

[30]  *In re Paige*, 584 F.3d at 1339.  Although the Tenth Circuit in *Paige* applied these factors to an appeal of a confirmed reorganization plan, the doctrine of equitable mootness extends to circumstances involving sale of the collateral.  *See* Wright et al., *supra*, at §3533.2.3.  Therefore, the *Paige* factors may serve as guideposts for the Court in this case.

[31]  *Id.* at 1339–40.

caused Plaintiffs a cognizable injury for which several possible forms of relief exist, despite the foreclosure sale to QuVIS Technologies, Inc ("QTI").  First, Plaintiffs argue that records indicate the assets are still in Seacoast's possession or control, permitting the bankruptcy court to undo the sale on remand.  Second, Plaintiffs note that if QTI is a successor of the debtor in this case—which appears likely given information Plaintiffs uncovered—the bankruptcy court has jurisdiction over the successor company and the assets of QTI remain a part of the bankruptcy estate.[32]  Moreover, the only Tenth Circuit decision that Seacoast cites as support for its proposition that the present appeal is moot is factually distinguishable.[33]  And more recently, in a more analogous case, the Tenth Circuit found that an appeal following the sale of bankruptcy collateral to a good faith purchaser was not moot because "there was a possibility of recovery, to which the appellant might be entitled, from proceeds of a sale of property in a bankruptcy case."[34]  Similarly, Plaintiffs have presented this Court with a legally cognizable claim for which the bankruptcy court could grant relief.  Therefore, a justiciable Article III case or controversy exists between the parties.[35]

---

[32] Because Plaintiffs did not provide any citations for their arguments on this point, the Court assumes Plaintiffs refer to the rule of successor liability. Generally, a party who purchases assets at a section 363 bankruptcy sale does not inherit the seller's debts. *See* 2 William L. Norton, Jr., *Norton Bankruptcy Law & Practice* § 44:25 (3d ed. 2012). But a purchaser may be subject to the bankruptcy court's jurisdiction in certain circumstances, such as when the purchaser is a successor of the debtor. *See Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995) (explaining that the theory of successor liability in federal common law allows the bankruptcy court to retain jurisdiction of the sold assets if there is "substantial continuity in the operation of the business before and after the sale").

[33] In that case, the Tenth Circuit upheld a district court decision that an appeal from the bankruptcy court by the New Mexico Environment Department was moot because there was no live controversy. *New Mexico Env't Dep't v. Foulston* (*In re L.F. Jennings Oil Co.*), 4 F.3d 887, 891 (10th Cir. 1993). The property in question was abandoned with the permission of the bankruptcy court after NMED declared that the property was not contaminated. *Id.* at 889. Given these facts, the Tenth Circuit concluded that NMED's claims that the trustee had not complied with state environmental laws was moot because there was no controversy between adversarial parties. *Id.*

[34] *In re BCD Corp.*, 119 F.3d at 856.

[35] Plaintiffs devoted significant attention to a third argument that the federal mootness doctrine does not apply when state law offers an attainable remedy. Plaintiffs' argument correctly notes that Kansas state law permits creation of constructive trusts as an equitable remedy to unjust enrichment. *See Draper v. Bank of America*, 205 P.3d 698, 706

Furthermore, Seacoast has not shown that a finding of equitable mootness is appropriate here. Equitable mootness is an exception to the federal courts' constitutional obligation to exercise jurisdiction over justiciable cases. For that reason, courts apply the doctrine only when it is necessary to "protect parties' settled expectations and the ability of a debtor to emerge from bankruptcy."[36] There are no compelling reasons to apply equitable mootness in this case. Although Plaintiffs did not file a motion to stay the foreclosure sale pending appeal, Plaintiffs did attempt to prevent the sale by opposing Seacoast's motion requesting that the bankruptcy court lift the automatic stay. Also, parties to the bankruptcy proceedings are not relying on any confirmed reorganization plan because QuVIS's assets have been liquidated. The purchaser of the those assets is not an bona fide third-party purchaser requiring the Court's protection, but instead appears to be a company related to QuVIS. And aside from Seacoast, QuVIS's creditors would not be adversely affected if the bankruptcy court undid or offered other equitable relief from the foreclosure sale because the unsecured creditors were not parties to the sale.[37] Moreover, application of the equitable

---

(Kan. 2009) (stating that a constructive trust is an appropriate remedy when a third-party holds title to property that must be conveyed to another party to avoid unjust enrichment). But the Court declines to adopt Plaintiffs' premise that courts may disregard Article III standing requirements in favor of state law remedies. Plaintiffs cite cases from other jurisdictions as support, but each of these cases involves state foreclosure sales wherein state law provided for redemption periods. *See In re Sullivan Cent. Plaza, I, Ltd.*, 914 F.2d at 735; *Onouli-Kona Land Co. v. Estate of Richards* (*In re Onouli-Kona Land Co.*), 846 F.2d 1170, 1173 (9th Cir. 1988); *West End Assoc., L.P. v. Sea Green Equities*, 166 B.R. 572, 576–77 (D. N.J. 1994). In fact, the Tenth Circuit Bankruptcy Appellate Panel explicitly rejected the rationale in these cases, noting that jurisdiction based on redemption rights shifts power from the courts to the debtor and would either force the courts to decide the appeal within the redemption period or improperly allow courts to expand the debtor's redemption period. *Egbert Dev. LLC v. Cmty. First Nat'l Bank* (*In re Egbert Dev., LLC*), 219 B.R. 903, 906–07 (B.A.P. 10th Cir. 1998). Therefore, the Court's jurisdiction over this appeal is based in no part upon the availability of relief for Plaintiffs in state court.

[36] *Curreys of Nebraska, Inc. v. United Producers, Inc.* (*In re United Producers, Inc.*), 526 F.3d 942, 946 (6th Cir. 2008).

[37] Seacoast did purchase the assets from the two creditors with superior priority—J. Greg Kite and the M. Christine Baugher Revocable Living Trust—prior to assigning its rights to QTI. *See* Second Amended Proposed Bid Procedures, *In re QuVIS, Inc.*, No. 09-10706 (Bankr. D. Kan. Nov. 19, 2010), ECF No. 443-1. Because Plaintiffs do not dispute that these two creditors had priority over Plaintiffs' unsecured interests, the Court presumes any equitable remedy fashioned by the bankruptcy court would protect the priority creditors' interests in the sale.

mootness doctrine lies firmly within the Court's discretion.  Rather than drawing inferences about the bankruptcy proceeding as a whole from the record in this adversary proceeding, the Court declines to exercise its equitable powers to moot the appeal because "the better and more appropriate course is to resolve this appeal on the merits."[38]

## B.    Standard of Review

Having decided that the Court may hear Plaintiffs' appeal, the Court must determine what standard of review governs the appeal.  Seacoast argues that the Court should review the bankruptcy court's decision for abuse of discretion because Plaintiffs appeal from denial of their equitable subordination claim.  Seacoast cites case law from other circuits holding that equitable subordination claims are reviewed for abuse of discretion because they are claims in equity.[39]  But  the Tenth Circuit has not adopted this rationale.  Instead, the Tenth Circuit abides by the established principle that a district court "review[s] the bankruptcy court's legal determinations *de novo* and its factual findings under the clearly erroneous standard."[40]  When a case involves mixed questions of fact and law, courts "conduct a de novo review if the question primarily involves the consideration of legal principles and apply the clearly erroneous standard if the question is primarily a factual inquiry."[41] Applying these canons, the Tenth Circuit Bankruptcy Appellate Panel reviewed de novo an equitable

---

[38]  *In re C.W. Mining Co.*, 641 F.3d at 1240.

[39]  *In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 326 (B.A.P. 6th Cir. 1999); *Paulman v. Gateway Venture Partners III, L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570, 583 (9th Cir. 1998); *see also Christian Life Ctr. Litig. Def. Comm. v. Silva* (*In re Christian Life Ctr.*), 821 F.2d 1370, 1376 (9th Cir. 1987) ("As the [bankruptcy] court exercises broad equitable power to subordinate claims, we review for an abuse of discretion."  (Citation omitted)).

[40]  *Conoco Inc. v. Styler* (*In re Peterson Distrib. Inc.*), 82 F.3d 956, 959 (10th Cir. 1996); *see also, e.g., Carter-Waters Okla., Inc. V. Bank One Trust Co., N.A.* (*In re Eufaula Indus. Auth.*), 266 B.R. 483, 477–78, 490–91 (B.A.P. 10th Cir. 2001) (applying a de novo standard of review to the issue of whether the bankruptcy court used the proper legal standard when considering a claim for equitable subordination).

[41]  *In re Eufaula*, 266 B.R. at 488 (quoting *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 572 (10th Cir. 1991)).

subordination claim that raised arguments similar to those at bar.[42]   Also, this Court recently reviewed de novo a bankruptcy court's grant of summary judgment in a case that included a request for equitable subordination.[43]   Because Plaintiffs' appeal involves only the legal question of whether Seacoast was entitled to summary judgment in Plaintiffs' suit for equitable subordination, the Court reviews the case de novo.[44]

**C.     Standard of Review on Summary Judgment**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[45]   A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[46]   The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[47]   The nonmovant must then bring forth specific facts showing a genuine issue for trial.[48]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory

---

[42] *See id.*

[43] *Speth v. Whitham Farms Feedyard, L.P.* (*In re Sunbelt Grain WKS, LLC*), 427 B.R. 896, 902 (D. Kan. 2010).

[44] Review for abuse of discretion is a more deferential standard than de novo review.  Because this Court, like the bankruptcy court, finds that Seacoast is entitled to summary judgment, the result in this case would be the same under either standard.

[45] Fed. R. Civ. P. 56(c).

[46] *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[47] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[48] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

allegations alone cannot survive a motion for summary judgment.[49]  The court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[50]

**D.      Plaintiffs' Claim for Equitable Subordination Contains No Genuine Issues of Material Fact and Defendant is Entitled to Judgement as a Matter of Law.**

Turning to the merits of this appeal, Plaintiffs argue that the bankruptcy court erred when it granted Seacoast's motion for summary judgment on Plaintiffs' equitable subordination claim. Section 510 of the Bankruptcy Code permits subordination of claims in specific circumstances. Relevant to this appeal, the Code states that courts may, "under the principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."[51]  Equitable subordination is a remedy intended to "ensure fairness in the bankruptcy process as a whole," rather than securing fairness between particular creditors.[52]  To prove that a fair bankruptcy proceeding requires equitable subordination of a claimant's security interest, plaintiffs must show the following: (1) the claimant engaged in inequitable conduct; (2) the conduct injured creditors or conferred an unfair advantage on the claimant; and (3) subordination of the claim is not inconsistent with the Bankruptcy Code.[53]  The Tenth Circuit places particular emphasis on the first prong, noting that "[t]he *critical inquiry* is whether there has been inequitable

---

[49] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[50] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[51] 11 U.S.C. § 510(c)(1).

[52] Norton, *supra*, at § 53:3.

[53] *Sloan v. Zions First National Bank* (*In re Castletons, Inc.*), 990 F.2d 551, 559 (10th Cir. 1993).

conduct on the part of the party whose debt is sought to be subordinated."[54]  Generally, inequitable conduct sufficient to justify subordination falls within one of three categories: (1) fraud, illegality, and breach of fiduciary duty; (2) undercapitalization; or (3) control or use of the debtor as an alter ego for the benefit of the claimant.[55]

The required burden and sufficiency of proof is not uniform across all claims for equitable subordination.  Rather, the relationship between the claimant and debtor dictates the burden of proof. If the claimant is an insider or fiduciary, the party requesting subordination need only show that the claimant engaged in "unfair conduct."[56]  But if the claimant is not an insider, the plaintiff must meet a significantly higher burden by showing that the claimant's wrongful conduct was "gross and egregious, tantamount to fraud, misrepresentation, overreaching or spoliation, or involving moral turpitude."[57]

In the context of bankruptcy, a creditor can be either a statutory or a nonstatutory insider. The Bankruptcy Code specifically defines an "insider" as a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor."[58]  But the Tenth Circuit has held that this list of definitions is not

---

[54] *Id.* (emphasis added) (citations omitted) (internal quotations omitted), *accord Sender v. Bronze Group, Ltd.* (*In re Hedged-Invs. Assocs., Inc.*), 380 F.3d 1292, 1300 (B.A.P. 10th Cir. 2004).

[55] *In re Hedged Invs. Assocs., Inc.*, 380 F. 3d at 1301 (citing *Fabricators, Inc. v. Technical Fabricators, Inc.* (*In re Fabricators*), 926 F.2d 1458, 1467 (5th Cir.1991)).

[56] *In re Eufaula*, 266 B.R. at 489.

[57] *Id.* (citations omitted) (internal quotations omitted).

[58] 11. U.S.C. § 101(31)(B) (defining the meaning of "insider" when the debtor is a corporation).

exhaustive; relationships not defined in the Code may be sufficiently close to consider a party an insider of the debtor, thereby creating a class of nonstatutory insiders.[59]

In this appeal, Plaintiffs argue that the bankruptcy court erred when it held that Seacoast was neither a statutory nor nonstatutory insider of QuVIS. Instead, Plaintiffs argue: (1) Seacoast was a statutory insider by virtue of Moulton's position as its proxy on QuVIS's board of directors; (2) alternatively, Seacoast was a nonstatutory insider because Seacoast, through Moulton, had a sufficiently close relationship to QuVIS and engaged in dealings at less than arm's length; and (3) as an insider, Seacoast's conduct in filing the UCC-1 statement was unfair to the other creditors.[60] The Court disagrees.

### 1.    *Seacoast is Not a Statutory Insider of the Debtor*.

Plaintiffs first argue that Seacoast is a statutory insider of QuVIS under section 101(31) of the Bankruptcy Code.  The 2005 Joinder Agreement between QuVIS and Seacoast gave Seacoast the power to "designate one (1) Person to serve as a member of [QuVIS's] board of directors."[61] Noting that directors of a corporate debtor are insiders,[62] Plaintiffs contend that Seacoast appointed itself as a director of QuVIS and that Moulton served as Seacoast's proxy on the board.  As support for their claim, Plaintiffs point to board meeting minutes and deposition testimony identifying

---

[59] *See Rupp v. United Security Bank* (*In re Kunz*), 489 F.3d 1072, 1079 (10th Cir. 2007) (noting that courts "are in agreement that there are two distinct types of insiders"—first, "those entities specifically mentioned in the statute" and second, "those not listed in the statutory definition, but who have a sufficiently close relationship with the debtor").

[60] The Court notes that Plaintiffs do not make an alternative argument that, even if Seacoast was not an insider, its conduct was sufficiently egregious to meet the higher standard that applies to non-insiders.  Therefore, a finding that Seacoast was an insider is essential to Plaintiffs' appeal.

[61] Doc. 3-2, p. 10.

[62] 11. U.S.C. § 101(31)(B)(i).

Moulton as a "*representative* of Seacoast Capital Partners, II, LLP," as well as Moulton's use of a Seacoast e-mail address and letterhead.[63]

Seacoast denies that it appointed Moulton to serve as its representative on the board and instead argues that Moulton was elected to QuVIS's board as an outside director in an individual capacity. Seacoast notes that Plaintiffs' own Complaint identifies Moulton, not Seacoast, as "a member of the Board of Directors of Debtor."[64] And Plaintiffs admitted without comment Seacoast's statement in its Motion for Summary Judgment that "Moulton was elected to serve as an outside director to the board of QuVIS."[65] In fact, the minutes from the meeting electing Moulton to the board show that Moulton—not Seacoast—was nominated to the board by another creditor, MTV Capital Limited Partnership, and was elected pursuant to QuVIS's bylaws rather than the Joinder Agreement.[66] Furthermore, Seacoast notes that the board meeting at which Moulton was labeled Seacoast's representative occurred before Moulton's 2006 election to the board.[67] In light of this specific evidence offered by Seacoast, Plaintiffs are left with nothing more than unsubstantiated speculation about Moulton's behavior on the board and Seacoast's motivations in lending QuVIS capital. These conclusory allegations are insufficient to survive summary

---

[63] Doc. 13, p. 11–12 (emphasis added).

[64] Doc. 2-4, ¶ 17.

[65] Doc. 2-11, p. 5 (Seacoast's Motion for Summary Judgment); Doc. 4-2, p. 3 (Plaintiffs' Memorandum in Opposition to Defendant Seacoast's Motion for Summary Judgment).

[66] Doc. 3-5, p. 7

[67] Another provision of section 4.25 of the Joinder Agreement permitted Seacoast to designate a person to attend QuVIS board meetings as an observer. Doc. 3-2, p. 10.

judgment,[68] and the Court thus declines to find that Moulton served as Seacoast's proxy on QuVIS's board of directors.

The Court also rejects Plaintiffs' argument that Seacoast was a "de facto director" of QuVIS by virtue of Moulton's position as a director of both corporations.  Plaintiffs are correct that Moulton was a "director of the debtor," and thus an insider as defined in the Bankruptcy Code.  But Moulton's status as a statutory insider does not extend to Seacoast because the idea that a corporation can be a "de facto director" under 11 U.S.C. § 101(31) has no basis in statute or case law.

First, section 101(31) clearly lists the relationships that create a statutory insider.  When construing statutes, courts interpret words and phrases in accordance with their plain and ordinary meaning of words and phrases.[69]  In the phrase "statutory insider," the word "statutory" means "enacted, regulated, or authorized by statute."[70]  Therefore, although the Tenth Circuit recognizes some *nonstatutory* insiders, a *statutory* insider is one clearly defined within the Bankruptcy Code. Here, the Bankruptcy Code states that a "director of the [corporate] debtor" is an insider.  According to the Tenth Circuit, "[w]hen the term 'director' is used in reference to a corporation, as it is used in the statutory definition of 'insider,' the term plainly means a person who is a member of the governing board of the corporation and participates in corporate governance."[71]  In light of the

---

[68] *Kojima v. Grandote Int'l Ltd. Liability Co.* (*In re Grandote Country Club Co., Ltd.*), 252 F.3d 1146, 1149 (10th Cir. 2001) ("The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims.  Unsupported conclusory allegations thus do not create a genuine issue of fact.").

[69] *See Toomer v. City Cab*, 443 F.3d 1191, 1194 (10th Cir. 2006) (citations omitted).

[70] *The American Heritage Dictionary of the English Language* 1707–08 (5th ed. 2011).

[71] *In re Kunz*, 489 F.3d at 1077–78.

Court's earlier finding that Seacoast was not a member of QuVIS's board of directors, Seacoast was not a "director of the debtor" under 11 U.S.C. § 101(31)(B)(i).  And because section 101(31)(B) does not include "de facto director," Seacoast is not a statutory insider of QuVIS under the Bankruptcy Code.

The Tenth Circuit has declined to adopt Plaintiffs' "de facto director" theory in *In re U.S. Medical*.[72]  In that case, a bankruptcy trustee sought to avoid transfers of interest to the creditor corporation pursuant the 11 U.S.C. § 547(b)(4)(B).  The trustee claimed the creditor was an insider because the creditor's CEO sat on the debtor's board of directors.[73]  The Tenth Circuit rejected the trustee's claim that the CEO's position on the board made the creditor a "de facto director" based in part on the facts of that case, as well as a concern that "a closeness-alone test would create a 'de facto director,' per se rule."[74]  In other words, because "de facto director" is not an enumerated type of statutory insider, and because nonstatutory insiders must have both a close relationship and inequitable bargaining power,[75] adopting the "de facto director" theory would constitute a new, third category of insiders.  Following the Tenth Circuit, this Court declines make such a secession from case law and congressional intent.

Furthermore, the case the Tenth Circuit relied upon in *U.S. Medical* did not present "de facto director" as a substantive theory at all.[76]  Instead, the court in *In re Papercraft Corp.* used the phrase

---

[72] *See Anstine v. Carl Zeiss Meditec AG* (*In re U.S. Medical, Inc.*), 531 F.3d 1272, 1282 (10th Cir. 2008).

[73] *Id.* at 1274.

[74] *Id.* at 1282.

[75] *See infra* Part D.2 (discussing the requirements for nonstatutory insiders).

[76] *See Comm. of Creditors Holding Unsecured Claims v. Citicorp Venture Capital, Ltd.* (*In re Papercraft Corp.*) 187 B.R. 486 (Bankr. W.D. Pa. 1995), *rev'd* 211 B.R. 813 (W.D. Pa. 1997), *aff'd sub nom. Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160F.3d 982 (3d Cir. 1998).

as a descriptive term that explained the degree of control a creditor had over its debtor.[77]  The court

noted that Pennsylvania law prohibited a corporation from serving as a corporate director, and held

that the representative in that case was an alter ego for the creditor corporation.[78]  In fact, the

representative explicitly testified that he served on the debtor's board on behalf of the creditor and

acted with the single creditor's best interests in mind, rather than the best interests of all creditors.[79]

Unlike Pennsylvania law, the Bankruptcy Code recognizes that a "person" may include an

individual, partnership, or corporation,[80] and Seacoast had a clear opportunity to appoint itself to

QuVIS's board pursuant to the Joinder Agreement.  There is no evidence beyond abject speculation

that Moulton acted as Seacoast's alter ego on the board.  Therefore, as in *U.S. Medical*, the "de facto

director" language and any attendant legal consequences under the Bankruptcy Code are

inapplicable here.

### 2.    *Seacoast is Not a Nonstatutory Insider of the Debtor.*

A closer question for the Court is whether Seacoast is a nonstatutory insider of QuVIS.  A

nonstatutory insider is one who has a sufficiently close relationship with the debtor that the insider's

conduct should be subject to closer scrutiny.[81]  A relationship subject to nonstatutory-insider status

---

[77]  187 B.R. at 494 n.6 ("In this case CVC had Muqaddam, its officer and one of Debtor's directors, as its instrumentality.  Muqaddam acted for CVC's benefit and on its behalf.  Through Muqaddam CVC achieved its insider status.  Through Muqaddam CVC was a de facto director and therefore was in a position to exercise some control."). When distinguishing the facts in *U.S. Medical* from those in *Papercraft*, the Tenth Circuit did acknowledge that "the 'de facto director' *language* seems particularly tailored to a situation where the director takes steps to enrich the creditor." *In re U.S. Medical, Inc.*, 531 F.3d at 1282 (emphasis added).  That statement is a far cry from recognizing a new theory of recovery and reflects the fact that the court in *Papercraft* used "de facto director" as descriptive language rather than a legally operative status.

[78]  *Id.* at 495.

[79]  *Id.*

[80]  11 U.S.C. § 101(41).

[81]  *See In re Kunz*, 489 F.3d at 1079.

is one that "compels the conclusion that the . . . entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of dealings between the parties."[82]  In other words, courts consider (1) the degree of control the insider holds over the debtor, and (2) "whether there is anything other than closeness to suggest that any transactions were not conducted at arm's length."[83]  Upon review of the uncontroverted facts, the Court finds that Seacoast was not a nonstatutory insider.

### a)      Degree of Control over Debtor

First, as the bankruptcy court noted, Seacoast did not exercise control over QuVIS as defined in the Small Business Investment Act.[84]  Seacoast never served on QuVIS's board of directors, and even assuming that Moulton was Seacoast's representative on the board, that body had at least four other directors with no connection to Seacoast.  Moreover, Plaintiffs' contention that Seacoast controlled QuVIS by virtue of Seacoast's "unique and cozy relationship with QuVIS and its key stakeholders" is supported only by conclusory allegations insufficient to survive a motion for summary judgment.[85]  Plaintiff apparently believes Seacoast enjoyed preferential treatment from QuVIS because Moulton had a "long-standing relationship" with one of QuVIS's investors, Owen Leonard.  Plaintiffs opine that because (1) Seacoast and Moulton had a business relationship, (2) QuVIS and Leonard had a business relationship, and (3) Moulton and Leonard had a pre-existing

---

[82] *Id.* (citations omitted) (internal quotation omitted).

[83] *See In re U.S. Medical, Inc.*, 531 F.3d at 1277; *see also Black's Law Dictionary* 866 (9th ed. 2009) (defining an "insider" in the context of bankruptcy as "[a]n entity or person who is so closely related to a debtor that any deal between them will not be considered an arm's-length transaction and will be subject to close scrutiny").

[84] *See* 13 C.F.R. § 107.865 (requiring a majority representation on the board of directors for an investor company to exercise control over a small business).

[85] *See In re Grandote Country Club Co., Ltd.*, 252 F.3d at 1149.

social relationship, Seacoast had an advantaged relationship with QuVIS that permitted Seacoast "to obtain, in essence *super powers* to the detriment of the outside creditors."[86]   Aside from these specious allegations, Plaintiffs fail to allege the existence of, let alone produce, any evidence showing that the aforementioned relationships were improper.   Other than Moulton's position as a director of both QuVIS and Seacoast and his friendship with Leonard, Plaintiffs offer no evidence that Seacoast enjoyed preferential treatment from QuVIS.   Therefore, Seacoast did not have a degree of control over QuVIS indicative of an insider relationship.

### b)      Transactions at Less than Arm's Length

Second, no evidence suggests that Seacoast engaged in transactions with QuVIS at less than arm's length.   An arm's-length transaction is "[a] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises."[87]   In other words, parties deal at arm's length when they have roughly equal bargaining power and each act in their own best interest.[88]   In a case often cited by the Tenth Circuit, a creditor diverted assets to a successor corporation using inside information about the debtor obtained when the creditor was the sole owner of the debtor corporation.[89]   The court found that the creditor's abuse of his former position precluded arm's length dealings and the court consequently held that the creditor was a nonstatutory insider.[90]   A nonstatutory insider relationship also existed in a case where

---

[86]  Doc. 13, p. 15 (emphasis added).

[87]  *Black's Law Dictionary* 1635 (9th ed. 2009).

[88]  *See In re U.S. Medical, Inc.*, 531 F.3d at 1277 n.4.

[89]  *In re Krehl*, 86 F.3d 737, 743 (7th Cir. 1996), *accord In re Kunz*, 489 F.3d at 1078–80.

[90]  *In re Krehl*, 86 F.3d at 743.

the debtor was a "captive purchaser of unneeded and sometimes unidentified goods" to inflate the creditor's assets.[91]

In both of the aforementioned cases, the insiders exploited relationships with debtors to act in a manner otherwise unauthorized by contract or law.  The Tenth Circuit case of *In re U.S. Medical, Inc.* provides a helpful contrast.  In *U.S. Medical*, the CEO of the creditor corporation served on the board of directors of the debtor corporation.[92]  The Tenth Circuit recognized that the creditor had access to inside information via the CEO, but held that the creditor corporation was not an insider because there was no evidence that the corporation acted in a way that suggested it had an advantage over the other creditors.[93]

Seacoast's dealings with QuVIS are more like those described in *U.S. Medical* than the cases in which courts found an insider relationship.  Seacoast acted only in accordance with the agreements it negotiated with QuVIS.  The 2005 Joinder Agreement permitting Seacoast to appoint a representative to QuVIS's board was obviously negotiated before Moulton could possibly access inside information as a director.  And all creditors, including Plaintiffs, signed an identical 2003 Note Agreement with QuVIS that permitted the creditors to file a financing statement in the event QuVIS failed to do so.  Even assuming that Seacoast had inside information from Moulton about the lapsed UCC-1, the other creditors were privy to that same information through examination of QuVIS's records.  And most importantly, it was the due diligence performed by Seacoast's outside counsel that disclosed that Seacoast's notes were unsecured.  It does not appear that Moulton played

---

[91] *Schubert v. Lucent Technologies Inc.* (*In re Winstar Communications, Inc.*), 554 F.3d 382, 397 (3d Cir. 2009).

[92] *In re U.S. Medical, Inc.*, 531 F.3d at 1274.

[93] *Id.* at 1281.

any significant role in this discovery or in the corrective actions. Seacoast's decision to file its own UCC-1 statement is thus more indicative of a sophisticated and prudent investor than a predatory creditor.

For the foregoing reasons, Seacoast's actions do not suggest it had an advantage over the other creditors, nor that Seacoast's dealings with QuVIS were at less than arm's length. Because Plaintiffs cannot show that Seacoast had any measurable degree of control over QuVIS or engaged in less-than-arm's-length transactions with QuVIS, as a matter of law, Seacoast was not a nonstatutory insider of QuVIS.

### 3.   *Seacoast Did Not Engage in Gross and Egregious Misconduct when it Filed its Own UCC-1 Financing Statement.*

Because Seacoast was not an insider to QuVIS, to prevail Plaintiffs must prove that Seacoast committed gross and egregious misconduct when it filed its own UCC-1 financing statement. The record in this case could not possibly support such a finding. Although the parties disagree over several factual allegations, the only *material* fact in dispute is whether Seacoast filed its UCC-1 financing statement on June 14, 2007, after receiving inside information from Moulton about the lapse of QuVIS's 2002 financing statement. Plaintiffs cite the following facts as evidence that Seacoast learned of the lapse from Moulton: (1) Moulton consulted Leonard about QuVIS matters and Leonard knew of the lapse sometime between June 1 and August 30, 2007; (2) QuVIS board meeting minutes do not reflect any discussion of the lapse, but the board did not record minutes for every meeting, so the board (including Moulton) *may* have known that the UCC-1 lapsed; and (3) Seacoast filed a UCC-1 financing statement rather than a UCC-2 amendment. From these "facts," the Court is meant to infer that Moulton knew about the lapse, he told Seacoast about it, and that information was the reason Seacoast filed its own UCC-1.

These allegations are so fanciful and speculative that they do not qualify as facts or inferences which the Court, for summary judgment purposes, must presume to be true.  The record before the Court does not contradict the conclusion that Seacoast learned of the lapse of QuVIS's 2002 financing statement when its outside counsel performed due diligence in connection with QuVIS's request to extend the maturity date of the creditors' notes, and not based on any information relayed by Moulton.  Nevertheless, even if the Court were to assume that Seacoast learned of the lapse via inside information from Moulton, Seacoast would still be entitled to judgment as a matter of law because (1) the 2003 Note Agreement signed by all creditors permitted each creditor to file its own financing statement, and (2) Seacoast owed no fiduciary duty to the other creditors.

First, it is axiomatic that corporations that "have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' "[94]  For that reason, courts considering the remedy of equitable subordination must "distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct."[95]  Here, the parties' Note Agreement explicitly provided: "Borrower authorizes each Lender to perform every act which such Lender considers necessary to protect and preserve the Collateral and Lenders' interest therein . . . ."[96]  As later became apparent, had Seacoast not perfected its interest in QuVIS's assets, it would not be entitled to relief in bankruptcy.  Accordingly, Seacoast took "appropriate, justifiable actions to

---

[94] *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990).

[95] *In re Castletons, Inc.*, 990 F.2d at 559 (quoting *Smith v. Assocs. Commercial Corp.* (*In re Clark Pipe & Supply Co.*), 893 F.2d 693, 701 (5th Cir. 1990)).

[96] Doc. 3-4, p. 8.

protect its security interest."[97]  The mere act of filing the UCC-1, therefore, was not inequitable conduct.

Second, Seacoast's failure to notify the other creditors of the lapse of QuVIS's UCC-1—no matter how the lapse came to Seacoast's attention—was not misconduct.  When a corporation becomes insolvent, its directors and officers owe a fiduciary duty not only to the shareholders, but also to the corporation's creditors.[98]  Non-insider creditors, however, do not owe any reciprocal fiduciary duty to each other.[99]  Absent such duty, plaintiffs must prove the heightened standard of egregious conduct by the creditor.[100]  Applying these principles to the present case, Moulton may owe Plaintiffs a fiduciary duty as a member of QuVIS's board of directors, but Seacoast was neither an insider nor a "de facto director" of QuVIS.  Seacoast had no legal obligation to sacrifice its own priority standing by refraining from filing a UCC-1, nor was Seacoast required to inform the other creditors of the lapse or file paperwork on their behalf.[101]

Furthermore, Seacoast's conduct here is worlds apart from the misconduct of the creditors in the cases Plaintiffs cited.  In *Papercraft Corp.*, the creditor corporation was permitted to place a representative on the board of the debtor's parent company.[102]  After the debtor filed for bankruptcy, the major creditors agreed upon a restructuring plan.  When the debtor filed the bankruptcy

---

[97]  *In re Castletons, Inc.*, 990 F.2d at 559.

[98]  *See Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857, 860 (10th Cir. 1986).

[99]  *In re Castletons, Inc.*, 990 F.2d at 559 (finding that a creditor in an equitable subordination case had "no fiduciary obligation to its debtor or to the other creditors of the debtor").

[100]  *Id.*

[101]  The Note Agreement specifically states that "[n]o Lender shall have any liability whatsoever to the Borrower, any other Lender or any third party" for any action taken pursuant to the Note Agreement.  Doc. 3-4, p. 9.

[102]  *See Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 984 (3rd Cir. 1998) (providing a summary of the proceedings in the bankruptcy and district courts).

paperwork, it failed to include a necessary disclosure statement.   During the time debtor's bankruptcy filing was defective, the creditor became a "vulture investor," surreptitiously purchasing more than 40% of the debtor's outstanding notes and achieving a sufficient interest in the debtor company to block the proposed reorganization.   The creditor then proposed its own reorganization strategy that placed the creditor at a distinct advantage over the other creditors.[103]

In *Estes v. N & D Properties Inc.*, the creditor was also a shareholder in the debtor corporation and was personally obligated on most of the debtor's loans from a bank.[104]   During this time, the debtor mismanaged the corporation's assets, and although the creditor had numerous opportunities to discover these problems, the creditor was not aware of the debtor's precarious financial position until the bank called its loans.   The creditor paid back the loans and was assigned the bank's interest in the debtor's assets shortly before the debtor declared bankruptcy.[105]   The Eleventh Circuit agreed with the bankruptcy court's decision to equitably subordinate the creditor's security interest claims.   The court found that the creditor  was both an insider and a controlling shareholder, and thus owed a fiduciary duty to the debtor's other creditors.   Placing the burden on the creditor to show the fairness of her actions, the court found that the creditor's conduct "indicate[d] that she was acting solely for her own benefit, to minimize her risk of loss without any consideration for other creditors."[106]   The court held: "Such pursuit of personal gain at the expense

---

[103]   *Id.* at 984–86.

[104]   799 F.3d 726, 728–29 (11th Cir. 1986).

[105]   *Id.* at 729–30.

[106]   *Id.* at 732.

of other creditors has been recognized as a breach of fiduciary duty justifying equitable subordination."[107]

The present case is distinguishable from *Papercraft* and *N & D Properties*. First, the creditors in those two cases were insiders of their respective debtors, and therefore, the courts analyzed their conduct under the "unfairness" standard. This Court has held that Seacoast was not an insider of QuVIS, so Plaintiffs must prove that Seacoast engaged in "more egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation."[108] Second, unlike the creditor in *Papercraft*, there is no evidence that Seacoast intended to jump the line of creditors in priority interests. And contrary to the court's finding in *N & D Properties, Inc.*, the record contradicts Plaintiffs contention that Seacoast gave no consideration to QuVIS's other creditors. In fact, in an unsuccessful argument to the bankruptcy court, Seacoast expressed its support for QuVIS's reorganization plan that called for all creditors to recover a pro rata share of QuVIS's assets.[109] In the same document, Seacoast argued that "Article 9 of the UCC does not require that each Noteholder be listed as a secured party on the UCC-1; rather it is sufficient that so long as even one Noteholder filed a UCC-1, such filing provides constructive notice of the terms of the Note Agreement, and the pledges contained therein."[110] Seacoast's representations to the bankruptcy court indicate that it did not intend to disrupt QuVIS's attempt in the Note Agreement

---

[107] *Id.*

[108] *In re Hedged-Investments Assoc., Inc.*, 380 F.3d at 1301–02.

[109] Document in Support of Disclosure Statement, *In re QuVIS, Inc.*, No. 09-10706 (Bankr. D. Kan. Jan. 12, 2010), ECF No. 200.

[110] *Id.* at ¶ 10.

to grant all creditors equal priority when Seacoast filed its UCC-1.  Plaintiffs cannot identify any concrete evidence to the contrary.

In conclusion, upon de novo review of Seacoast's motion for summary judgment on Plaintiffs' claims for equitable subordination, the Court finds that Plaintiffs have failed to present specific facts showing a genuine issue for trial.  Because Seacoast is not an insider of QuVIS's and Seacoast did not engage in inequitable conduct when it filed its own UCC-1 financing statement, Seacoast is entitled to judgment as a matter of law.[111]

**IT IS ACCORDINGLY ORDERED** this 13th day of March, 2012 that the bankruptcy court's February 18, 2011, Order granting Defendant's Motion for Summary Judgment (Doc. 4-4) is hereby **AFFIRMED**.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[111] Because the Court finds that Seacoast did not engage in inequitable conduct, it need not examine the second and third requirements for equitable subordination—the creation of an unfair advantage for the claimant and consistency with the Bankruptcy Code.  *See In re Hedged-Investments Assocs., Inc.*, 380 F.3d at 1303 ("[A] finding of inequitable conduct is a necessary prerequisite to ordering equitable subordination.").